**In re MIDWEST PROCESSING COMPANY, Debtor.**

**Bankruptcy No. 84–05165.**

United States Bankruptcy Court,
D. North Dakota.

May 24, 1984.

Bruce Bohlman, Grand Forks, N.D., and Michael Hinman, Bismarck, N.D., for Basin.

Neal Wolf; Timothy Davies and David T. DeMars, Fargo, N.D., for Midwest.

Michael J. Maus, Dickinson, N.D., for Pump Systems, Inc.

Jack McDonald, Bismarck, N.D., for Dakota Fire & Safety Equip. Co.

## MEMORANDUM OPINION

WILLIAM A. HILL, Bankruptcy Judge.

Basin Electric Power Cooperative [Basin Electric] filed with the Court on March 29, 1984, an involuntary petition requesting

that the Court order Chapter 11 relief for the alleged Debtor, Midwest Processing Company [Midwest]. Midwest filed with the Court on April 6, 1984, a "Motion for Order of Dismissal and Damages," a "Motion for Judgment" under section 303(i) of the Bankruptcy Code, and a "Motion to Dismiss" pursuant to section 303 of the United States Bankruptcy Code. An expedited hearing on the motions to dismiss was held before the undersigned on April 11, 1984. Pursuant to the expedited hearing, an Order Denying the Motions to Dismiss was entered on April 16, 1984, and a hearing on the Order for Relief was set for May 4, 1984. Midwest filed its Answer to the involuntary petition on April 20, 1984. Motions to join as petitioners in this proceeding were filed on April 30, 1984, by Minot Auto Supply, Dakota Fire and Safety Equipment Company, and Apollo Piping Supply, Inc. A further motion to join as petitioner in this proceeding was filed on May 3, 1984, by Pump Systems, Inc. A Disclaimer and Withdrawal of Motion to Intervene or to Join has been filed by both Minot Auto Supply, Inc., and by Apollo Piping Supply, Inc. Midwest filed on May 3, 1984, a Motion to Dismiss pursuant to section 305(a)(1) of the Bankruptcy Code. A hearing on the request for an Order for Relief was held on May 4, 1984 and continued to and concluded on May 5, 1984. After consideration of the evidence as submitted at trial and the briefs of the parties, the Court finds the relevant facts to be as follows:

## FINDINGS OF FACT
### MIDWEST PROCESSING COMPANY

Midwest operates a sunflower processing plant near Velva, North Dakota. The company was formed in 1979 as a joint venture between the Pillsbury Company and Neshem-Peterson & Associates. Later, the A.E. Staley Company of Decatur, Illinois joined the venture and presently the corporate stock of the company is owned in the following percentages: 46% Pillsbury Company; 46% A.E. Staley; and 8% by Neshem-Peterson.

Statements of operations from Midwest reflect that the company has operated at a substantial loss since 1982. Midwest had net earnings of $4,540,932.00 in 1982. The sale of tax benefits in 1982 afforded Midwest $12,000,000.00 in income. Without the tax benefits, Midwest had an operating loss of $3,700,625.00 in 1982. The financial statements also indicate a net loss of $7,742,044.00 for Midwest in 1983. The statements show an overall decrease of approximately $4,000,000.00 in Midwest's assets from 1982 to end of fiscal year 1983. Midwest's net loss of operations in the first seven months of fiscal year 1984 total $7,068,683.00.

Midwest shut down their processing facility in the Spring of 1983 until October 1983. Basin Electric understood at that time that the design in Midwest's de-hulling process was flawed and that the 1983 shut-down was to afford Midwest a one-time opportunity to make major modifications in their processing facility. Midwest again shut down their operations in mid-February of 1984. The processing plant ceased its operations in February of 1984 when it became apparent that it would not be profitable to continually run the processing facility. In late February and early March 1984, Midwest laid off 52 employees. Midwest presently employs 17 people, ten of which are office personnel. It is contemplated the plant will not be reopened until an acceptable crush margin is attained. Midwest cannot insure that margins will favor reopening of the processing facility at the time of the 1984 harvest. Midwest does contemplate, however, that the plant may be reopened even if the margins are not favorable merely to maintain visibility and instill confidence in their continued operations among the sunflower growers in the area. At the time of trial, Midwest still had not resumed crushing operations.

Although Midwest has been operating at a continual loss since it opened its plant in 1982, it has generally been paying its bills on a current basis. Midwest has been able to keep current on its payments because of

injections of capital made by its stockholders. The Pillsbury Company and the A.E. Staley Company in August 1983 each provided 2.25 million dollars to Midwest Processing. Additionally, Pillsbury and Staley Company jointly injected $300,000.00 of capital into the operations of Midwest in April 1984. Midwest repaid Pillsbury and Staley for its August 1983 cash advances through an issuance of more stock in Midwest. Additional operating funds were generated by the sale of 120 tons of sunflower seed which remained on hand after the processing plant ceased its operations in February 1984.

At the time of trial, creditors which remained unpaid were, as follows:

| | CREDITOR | CLAIM | REASON FOR NON–PAYMENT |
|---|---|---|---|
| 1. | W.C. Cantrell | $121,875.80 | Claim is not payable until Cantrell receives specifications for work done. |
| 2. | McHenry County Auditor | $173,627.43 | Tax bill is disputed. |
| 3. | National Sunflower Association | $ 4,441.37 | Association-type charge which is not required at this time. |
| 4. | Texas Instruments Company | $ 10.00 | No invoice for the work has been received. |
| 5. | Western Railroad Association | $ 445.07 | Invoice was received on April 30, 1984. |
| 6. | Brokerage Services | $ 3,043.00 | No invoices for the services have been received. |
| 7. | Commodity Purchase Contracts | $1,474,150.00 | Contracts are for future periods and are not currently due. |
| 8. | Open Purchase Orders | $ 5,003.40 | Midwest hasn't received bills or the goods on those purchases. |

The list of current obligations which are set out above do not include a disputed obligation to Basin Electric Power Cooperative, nor does it include pre-petition claims of the stockholders, which were as follows:

Neshem-Peterson $97,655.36
Pillsbury $201,196.39
A.E. Staley $397,607.78

The pre-petition claims of the stockholders listed above do not reflect the recent cash injection of $300,000.00. Midwest asserts that the stockholders have not requested payment on any of its pre-petition claims and in fact are allowing Midwest to defer payment on those obligations. Outside of the disputed obligation to Basin Electric Power Cooperative, the most significant obligation Midwest has is to its long-term note holders.

Midwest has what it cites as a long-term obligation in the principal amount of $45,000,000.00. Of that long-term obligation, 90% of it is guaranteed by the Farmers Home Administration. The payments on the principal amount of the loan do not begin until 1985. Midwest is obligated, however, to make semi-annual payments of interest up until the year 1985. An interest payment of $2,786,062.61 was due February 28, 1984. Midwest did not make the payment due on February 28, 1984, and since that time has been negotiating with the note holders for a new payment schedule. Under the payment schedule which now exists, another interest payment of $2,786,062.61 is due on August 31, 1984.

Midwest acknowledges its poor financial position. Nevertheless, Midwest resists formal reorganization through a bankruptcy proceeding. Midwest cites the past support of its shareholders and a potential work-out arrangement as evidence that a formal bankruptcy proceeding is not necessary in this instance. If Midwest's creditors agree to the work-out proposals, Midwest anticipates resuming its operations in

the Fall 1984. The work-out proposal which Midwest has been negotiating with its creditors is essentially to defer payments, both principal and interest, on its long-term obligations for three years. After that period of three years, Midwest would then begin semi-annual payments on both principal and interest. The work-out proposal contemplates that the Farmers Home Administration will become the holder of notes which evidence the guaranteed portion of the long-term debt. The proposal also contemplates that the 4.5 million dollar unguaranteed portion of the long-term debt will be bought out by Pillsbury at a percentage of its face value. An adjunct to the work-out proposal is a separately proposed agreement whereby A.E. Staley Company will purchase Pillsbury's interest in Midwest.

Fifteen out of sixteen participating unguaranteed note holders have executed preliminary agreements, which Pillsbury characterizes as conditional agreements, to assign their notes to Pillsbury in exchange for 75% of the face value of the note. The conditions contained in the agreements are summarized, as follows:

1. The involuntary bankruptcy proceeding is dismissed.
2. New or amended agreements are executed between Basin and Midwest regarding the supply of processed steam and water and the purchase of sunflower hulls.
3. The long-term debt is restructured.
4. All participating unguaranteed note holders execute and deliver their conditional assignment agreement to Pillsbury.
5. Pillsbury receives the opinion of its counsel with regard to the transactions contemplated.
6. The separation agreement between Pillsbury and A.E. Staley dated April 23, 1984, is closed.

The conditions contained in the agreements executed by the participating unguaranteed note holders must be met on or before June 30, 1984, or the conditional agreements become null and void. Twelve of the sixteen participating unguaranteed note holders have filed with the Court affidavits supporting Midwest's requests for dismissal of the involuntary bankruptcy proceeding. Officers from Pillsbury, A.E. Staley Company, and Midwest all acknowledge, however, no work-out arrangement will be possible without reaching an adequate agreement with Basin Electric.

BASIN ELECTRIC POWER COOPERATIVE

The initial petitioner, Basin Electric Power Cooperative, is intimately involved in the operations of Midwest through its William J. Neal Station, a lignite coal-fired baseload generating plant located near Velva, North Dakota. Basin Electric purchased the Neal Station from Central Power Electric Cooperative in 1973. The Neal Station is Basin Electric's smallest and most expensive lignite generating plant. Basin Electric is a non-profit wholesale power supplier. Accordingly, Midwest receives its power from a local power cooperative and not from Basin Electric. Basin Electric does supply Midwest with processed steam and demineralized water. Basin Electric in turn purchases from Midwest sunflower seed hulls which are burned through Basin Electric's generating operations. Basin Electric and Midwest executed on December 12, 1980, separate agreements for the sale of water and steam and the sale of sunflower seed hulls. In order to service the agreements, Basin Electric began a sunflower construction project which included steam and water related improvements and construction of hull handling facilities at the Neal Station. Basin Electric's total investment in the sunflower improvements amounted to $5,829,450.71. Basin Electric contemplated that it would recover the cost of the sunflower improvements through charges outlined under the agreements dated December 12, 1980, which included as a component, depreciation and interest on the investment cost of the facilities that Basin Electric constructed in order to furnish its services to Midwest.

The sunflower construction project was completed June 1, 1982, and Midwest began operations that date. From June 1982 until August 1982, Midwest maintained a $4,000,000.00 deposit at the First National Bank of Minneapolis as security for Basin Electric's investment in improvements under the sunflower construction project. In August of 1982 a letter of credit with the Continental Illinois Bank was put into effect in order to secure Basin Electric's investment in the sunflower project. The letter of credit was renewed in April of 1983 and was set to expire on March 31, 1984. In conjunction with the letter of credit, an escrow agreement which detailed the terms under which the parties could draw on the letter of credit was executed and extended by the parties to correspond with the terms of the letter of credit. The escrow agreement provided, in part, that the parties could draw on the letter of credit, as follows:

As Escrowee, you are hereby directed to hold, deal with and dispose of the aforesaid property and any other property at any time held by you hereunder in the following manner, subject however, to the terms and conditions hereinafter set forth:

. . . . .

You shall pay over all monies and investments held hereunder (including all earnings thereon) either (i) to Basin, upon presentation to you of a certified copy of a petition filed against Midwest Processing Company ("MPC") a North Dakota corporation, under the United States Bankruptcy Code, as amended, and a certificate of the Secretary of Basin stating that such petition remains undismissed for a period of sixty days since filing, or (ii) to Continental, upon presentation to you of a certificate of the Secretary of MPC stating that any petition filed against MPC under the United States Bankruptcy Code, as amended, has been dismissed.

Midwest asserts that Basin Electric's sole motivation for petitioning for involuntary relief as against Midwest was to draw on the letter of credit established to secure Basin Electric's investment costs in its sunflower project. Midwest alleges that when Basin Electric filed the involuntary petition with the sole motivation to draw on the letter of credit, it filed the petition in bad faith. Although Basin Electric admits that the pending expiration of the letter of credit triggered the filing of the bankruptcy petition, the expiration of the letter of credit was only the last in a parade of events which took place throughout the beginning of 1984 which gave rise to growing concern on the part of Basin Electric over the future operations of Midwest.

Basin Electric initially became concerned over the situation with Midwest when Midwest ceased its operations February 16, 1984. Soon after that date, Midwest began laying off large numbers of its employees. On February 23, 1984, Arnold Ketterling, manager of the Department of Accounting and Finance for Basin Electric wrote to the President of Midwest, Tom Brokl, wherein Ketterling requested that Midwest insure that a letter of credit would be maintained after March of 1984 to secure Midwest's payments under its contracts with Basin Electric. A new letter of credit had been a source of discussions between Basin Electric and Midwest since September 1983. Basin Electric has consistently taken the position that sections 10.1 of the Water and Steam Sales Agreement and the Sunflower Seed Hull Sales Agreement required that Midwest provide and maintain either a payment bond or a letter of credit in an amount and in a form reasonably acceptable to Basin Electric as security for receipt of the payments Midwest was required to make under the contracts. Midwest was unable to assure Basin Electric in response to its letter of February 23, 1984, that a letter of credit would be maintained as security. As a result, Arnold Ketterling again wrote Thomas Brokl on February 28, 1984, giving Midwest notice that they were in default under the contracts by failing to provide adequate assurance that a letter of credit would be maintained. The letter dated February 28, 1984, also indicated that

the default could be cured by a renewal of the present letter of credit for a period of ninety (90) days. On February 28, 1984, Midwest also missed payment of the interest due that date on its long-term loan obligation.

A meeting was held March 20, 1984, at the offices of Basin Electric between representatives of Basin Electric, Midwest, Pillsbury, and A.E. Staley Company. Tom Brokl, President of Midwest, outlined market conditions in the sunflower industry, the competition between area sunflower processing plants, and the stresses those factors placed upon Midwest's position in the marketplace. Tom Brokl acknowledged that Midwest had missed an interest payment on its long-term debt due February 28, 1984, and explained Midwest's efforts at restructuring payments on that debt. Brokl also explained Pillsbury's efforts at buying out the unguaranteed long-term note holders, and likewise Pillsbury's efforts to sell its interest in Midwest to A.E. Staley Company. Finally, Brokl requested that as part of the reorganization of Midwest that Basin Electric guarantee services for three and one-half years and also reduce its steam and water charges by approximately 25%. Basin Electric did not receive any assurance at the meeting that the letter of credit would be maintained as security for receipt of the payments due it under the contracts.

Arnold Ketterling phoned Tom Brokl on March 23, 1984, expressing concern that Basin Electric had yet received no assurance that Midwest would maintain the letter of credit. Tom Brokl informed Ketterling during that conversation that he had no authority to make any assurances and that Midwest did not intend to renew the letter of credit. By letter dated March 29, 1984, and addressed to Tom Brokl, President of Midwest Processing Company, Ketterling terminated the contract agreements based on Midwest's failure to cure the default which was noticed by Basin Electric in its letter dated February 28, 1984. In conjunction with the termination on March 29, 1984, Basin Electric demanded from Midwest the outstanding principal and interest on the cost of the sunflower improvements. Basin Electric calculates that Midwest's debt on March 29, 1984, for the sunflower improvements amounted to $5,346,755.00. Midwest strenuously disputes that they were required under the contracts to provide Basin Electric a letter of credit as security for the contract payments, and that Midwest's failure to provide such letter of credit gave rise to a default under the contracts. Midwest does concede, however, that Basin Electric does hold a disputed claim of a value $5,000.00 greater than its security.

INTERVENING PETITIONERS

Motions to join the petition filed by Basin Electric were subsequently filed by two creditors. Pump Systems, Inc. filed its Motion to join as petitioner in this proceeding on May 3, 1984. Records of Pump Systems, Inc. reveal that Midwest was billed March 1, 1984, in the amount of $90.28 for goods shipped out that date. The records of Pump Systems, Inc. also indicate that it received payment on April 9, 1984, for the goods it shipped Midwest on March 1, 1984. Accordingly, Midwest owed Pump Systems, Inc. $90.28 for the purchase of supplies on the date that Basin Electric filed its involuntary petition. Joel Bleth, President and General Manager of Pump Systems, Inc., acknowledged that his company was not prompted to join in this proceeding because of a fear that it might not be paid on its claim against Midwest. On the contrary, Bleth testified that Midwest was one of its smaller customers. Midwest never owed Pump Systems more than a few dollars at a time and generally paid its bills to Pump Systems, Inc. on a timely basis. Bleth testified he had no basis to allege that Midwest had not been paying its debts as they fell due. Nevertheless, Pump Systems, Inc., supported Basin Electric's petition for involuntary relief through its motion to join as a petitioner. Bleth indicated that his company was motivated to join in the proceeding because it did not wish to see the proceeding fail without the Court addressing the merits of the involuntary petition. Bleth acknowledged that his company received from Basin Electric an indemnification for certain costs it might in-

cur as a result of its joining the petition for involuntary relief. The broad indemnification provides, as follows:

In consideration of the Pump Systems, Inc., agreement to join Basin Electric Power Cooperative in the filing of an involuntary petition in Bankruptcy (Bankruptcy No. 84–05165) against Midwest Processing Company, Basin Electric hereby covenants to indemnify, protect and save Pump Systems, Inc. harmless from and against any and all liabilities, obligations, losses, compensatory or punitive damages, penalties, claims, actions, suits, judgments, costs, expenses and disbursements, including, without limitation, legal fees and expenses, of any kind and nature whatsoever without limitation as to amount which may be imposed on, incurred by or asserted against you pursuant to 11 U.S.C. Section 303(i) or in any way relating to or arising out of your joining with Basin Electric in the involuntary petition filing against Midwest Processing Company.

Dakota Fire and Safety Equipment Company filed its Motion to join as a petitioner in this proceeding on April 30, 1984. Midwest owed Dakota Fire and Safety on March 13, 1984, the sum of $206.69. On April 13, 1984, Dakota Fire and Safety received two payments from Midwest, leaving a zero balance on the account as of April 14, 1984. Darrell McQuay, President of Dakota Fire and Safety Equipment Company, Inc., admitted that Midwest paid its debts to his Company on a timely basis. Nevertheless, McQuay personally believed that Midwest generally was not paying its debts as they came due. McQuay acknowledged that Basin Electric was a good, steady customer of Dakota Fire and Safety. Dakota Fire and Safety received an indemnification from Basin Electric which was similar to that received by Pump Systems, Inc.

## DISCUSSION AND CONCLUSIONS OF LAW

### I.

■ Midwest initially disputes that there are a sufficient number of petitioning credi-

tors to support the present involuntary proceeding. The requirements for an involuntary bankruptcy petition are set out in 11 U.S.C. § 303. Section 303 of the Bankruptcy Code provides in part, as follows:

(b) An involuntary case is commenced by the filing with the Bankruptcy Court of a petition under Chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or an indenture trustee representing such a holder, if such claims aggregate at least $5,000.00 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under sections 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $5,000.00 of such claims.

11 U.S.C. § 303(b). Under section 303(b) of the Bankruptcy Code, three or more creditors must join in an involuntary petition where the alleged debtor has more than twelve creditors. When calculating the number of creditors for purposes of section 303(b)(2), recipients of preferential transfers and insiders are not included as holders of claims. *In re Skye Marketing Corp.*, 11 B.R. 891, 899 (Bkrtcy.E.D.N.Y. 1981). A majority of jurisdictions do include, however, small recurring claimants in the number of holders for purposes of section 303(b)(2) of the Bankruptcy Code. *In re Hoover*, 32 B.R. 842, 851 (Bkrtcy.W.D.Okla.1983). In the present instance, it is undisputed that Midwest has sixteen participating unguaranteed long-term note holders in addition to its other claimants. It is evident, therefore, that the involuntary petition in this proceeding must be supported by three petitioners. Midwest argues that

there are not three petitioners in this instance because of the presence of indemnity agreements, the intervening creditors have failed to join in the allegations of the petition, the claims of the intervening creditors have been fully paid, or because bad faith on the part of one or more of the petitioning creditors excludes that petitioner from participating in the proceeding.

Initially, Midwest would have this Court dismiss the petition by reason of the failure of Pump Systems, Inc., to join in the allegations of Basin Electric's involuntary petition. Midwest cites the testimony of Joel Bleth, President of Pump Systems, Inc., as evidence of Pump Systems' failure to join in the allegations of the petition. Bleth testified at the hearing on the Order For Relief that he had no reason to believe that Midwest was not paying its debts as they came due. Pump Systems, Inc., filed its Motion to Join the involuntary petition on May 3, 1984. While there is a strict burden upon the petitioning creditors to prove a basis for involuntary relief, the procedural requirements for initiating the involuntary proceeding are not as stringently enforced. *See In re Gill Enterprises, Inc.* 15 B.R. 328, 331 (Bkrtcy.D.N.J. 1981) ("The purpose of § 303(b)(1) is to allow more flexibility on considering involuntary actions and not to restrict or limit the involuntary process."); *In re All Media Properties, Inc.*, 5 B.R. 126, 134 (Bkrtcy.S. D.Tex.1980) ("The notion of less restrictive jurisdictional requirements for bringing an involuntary petition is consistent with the other broad grants of jurisdiction given to the bankruptcy courts under the Bankruptcy Reform Act of 1978."). The authorities suggest that a flexible approach should be taken with regard to the requirements for initiating an involuntary proceeding. The result of such a flexible approach is that absent a clear abuse of process, the court should address an involuntary petition on its merits. As for intervention, there is no basis for a court to deny a creditor his right to intervene in an involuntary proceeding where that creditor does not voluntarily withdraw. *See In re Rush*, 10 B.R. 526, 527 (Bkrtcy.N.D.Ala.1981)

("Under said section 303(c) a party has a right to intervene in an involuntary case under said Title 11, without any leave by the Court or the exercise of any power by the Court."). Midwest does not dispute that as of the date the petition was filed Pump Systems, Inc., held an unsecured claim which was not contingent as to liability and which remained unpaid. Midwest does request however that the Court construe the testimony of Joel Bleth as a withdrawal of Pump Systems' Motion to Intervene. Bleth testified that the written Motion to Intervene filed on behalf of Pump Systems, Inc. on May 3, 1984, was supported by the decision of the full board of directors of Pump Systems. Bleth also testified on behalf of Pump Systems, Inc., as an officer of that company that he believed Midwest was paying its debts as they became due. It would be unfair for this court to deny the written request of Pump System's full board of directors on the basis of oral observations given by an officer of the company. Accordingly, the court recognizes Pump Systems, Inc. as a petitioner in this proceeding.

Midwest asserts that the debts it had to the intervening creditors on the date the petition was filed have been paid in full. Accordingly, Midwest argues that the intervening creditors no longer have standing to support the involuntary petition filed by Basin Electric. It has been noted that for purposes of granting or denying an order for relief under section 303(h) of the Bankruptcy Code, the alleged debtor's debts must be examined at the time the petition is filed. One decision has indicated that "[w]hile post-petition payments of delinquent accounts may be material in some circumstances to the issue of whether relief should be granted under § 303(h)(1), post-petition payments ordinarily indicate a last ditch effort on the part of the alleged debtor to avoid bankruptcy proceedings." *In re Win-Sum Sports, Inc.*, 14 B.R. 389, 392 (Bkrtcy.D.Conn.1981) (citing *In re All Media Properties*, 5 B.R. at 144). This Court believes that the approach towards post-petition payments of claims under

§ 303(h) should likewise apply to the court's analysis under section 303(b) of the Bankruptcy Code. A claimant's standing under 11 U.S.C. § 303(b) should not be eliminated merely because an alleged debtor pays its debt to that claimant after an involuntary bankruptcy petition has been filed. To hold otherwise would disregard those claimants whose motives for petitioning for involuntary relief reach beyond the present satisfaction of their claims. Both intervening petitioners in this proceeding contemplate that they will provide goods and services to Midwest in the future, and are therefore concerned with the future operation of that company. In the present instance, the intervening petitioners held undisputed and unpaid claims against Midwest at the time the petition was filed. Those facts alone give them the right to intervene as petitioners in this proceeding.

Evidence submitted at the hearing on the Order For Relief indicates that the intervening petitioners were encouraged by Basin Electric to join in this proceeding through use of indemnification agreements. Midwest argues that Basin Electric bought out the interests of the intervening creditors through the use of the indemnification agreements, and therefore stands in the shoes of those petitioners. Midwest further argues that since Basin Electric stands in the shoes of the intervening petitioners, there is essentially only one claimant which supports the involuntary petition in this proceeding. While Basin Electric did encourage the intervening creditors to participate through use of the indemnification agreement, the court does not find that the petitioning creditors stand as one petitioner. The agreements between Basin Electric and the intervening creditors do not insure that the intervening creditors will remain as participants in this proceeding. The intervening creditors are free to withdraw their motions to join in the petition at any time. Further, it is clear from testimony at the hearing on the Order For Relief that the intervening creditors' motives for participating in these proceedings were different from that of Basin Electric. While all the petitioners generally seek to stabilize the future operations of Midwest, Basin Electric is also concerned with its future status as a secured creditor while the intervening creditors as holders of unsecured claims seek assurance from the Bankruptcy Court that their future transactions with the alleged Debtor are protected. The Court can in no way find that the indemnity agreements transform the intervening creditors into a mere extension of Basin Electric. Three distinct petitioning creditors remain in this proceeding.

As the alleged Debtor tells it, bad faith oozes from every crack and crevice of this proceeding. Midwest argues that the petition should fail by reason of the bad faith accompanying these proceedings. One court has indicated that bad faith may be exorcised from a proceeding by the mere dismissal of the party who committed the alleged bad faith. *See In re Trans-High Corp.,* 3 B.R. 1 (Bkrtcy.S.D.N.Y.1980). Another court has taken the position, however, that fraud or bad faith should be alleged as a defense to the merits of the petition. *See In re Rush,* 10 B.R. 526 (Bkrtcy.N.D.Ala.1980). Under the reasoning of the court in *Rush,* the establishment of bad faith does not merely disqualify a petitioning creditor, but gives rise to a dismissal of the entire proceedings. This court will follow the reasoning of *Rush,* and will address the issues of bad faith in conjunction with this court's discussion of the merits of the involuntary petition.

This court finds no basis to disqualify any of the petitioning creditors in this proceeding. As this court has noted, intervention as a petitioner in an involuntary bankruptcy proceeding is a right which the court must acknowledge. As long as the claims which the petitioners hold are not contingent as to liability and aggregate an unsecured sum of at least $5,000.00, the court will accept the petition for involuntary relief and address its merits. Although Midwest disputes the claim of Basin Electric, it does not dispute that Basin Electric asserts a claim in an amount which exceeds by more than $5,000.00 the value of its claimed security. Basin Electric has

standing to be a petitioning creditor in this proceeding, notwithstanding that it is the holder of a disputed claim. *See In re R.N. Salem Corp.*, 23 B.R. 452, 456 (Bkrtcy.S.D. Ohio 1982) ("One need thus look no further than the statute itself for a determination that 'claim' for purposes of the Bankruptcy Code includes disputed claims and unmatured claims, . . ."). As the court has previously indicated, the intervening creditors also have standing as petitioners in this proceeding. Since there are three qualified petitioners which support the involuntary petition in this proceeding, the court will address the merits of that petition.

## II.

An Order For Relief will be entered in a particular instance where the requirements of § 303(h) for Bankruptcy Court are met. That section provides, as follows:

If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—

(1) the debtor is generally not paying such debtor's debts as such debts become due; or

. . . .

11 U.S.C. § 303(h). In this matter, Midwest has timely filed an answer to the petition requesting involuntary relief. The issue, then, is whether the alleged Debtor is generally not paying its debts as they become due. Midwest strongly resists the allegation that it is not meeting its financial obligations on a current basis.

■ Courts have been unable to arrive at a uniform standard for determining what constitutes a failure to pay debts generally. The legislative history of 11 U.S.C. § 303 offers little guidance for decision makers, since the House and Senate bills contained substantially different definitions of the test finally adopted by the conference committee. *In re Hill*, 8 B.R.

779 (D.Minn.1981). One court has noted that under section 303(h) of the Bankruptcy Code, the primary factor to be considered is the "cessation of payment as distinguished from ability to pay." *In re 7H Land and Cattle Co.*, 6 B.R. 29, 31 (Bkrtcy.D.Nev. 1980). Other courts have adopted more mechanical tests wherein they review a variety of significant factors when determining whether an order for relief should be entered. *See In re Gill Enterprises, Inc.*, 15 B.R. 328, 332 (Bkrtcy.D.N.J.1981) (The court looked at five factors: the timeliness of payments on past due obligations; the amount of debts long overdue; the length of time during which the debtor has been unable to meet large debts; any reduction in the debtor's assets; and the debtor's deficit financial situation.). *In re Reed*, 11 B.R. 755, 760 (Bkrtcy.S.D.W.Va.1981) (The Court reviewed four factors: the number of debts; the amount of indebtedness; the duration of the debtor's non-payment; and the nature and conduct of the debtor's financial affairs.). Although mechanical tests offer some guidance when reviewing the merits of an involuntary petition, a court should not restrict itself solely to factors included in a mechanical test. An early bankruptcy decision which construed 11 U.S.C. § 303(h) noted that "[t]he term 'generally' was not defined by the Bankruptcy Code in order to avoid the result suggested by the mechanical test put forth by the alleged debtors and to give the bankruptcy courts enough leeway to be able to deal with a variety of situations that will arise." *In re All Media Properties, Inc.*, 5 B.R. 126, 143 (Bkrtcy.S.D.Tex. 1980). Accordingly, courts must be sensitive to the unique circumstances involved in each involuntary proceeding.

■ When analyzing an alleged debtor's payment history, the courts excuse nonpayment of claims which are a matter of significant dispute. *See In re Goldsmith*, 30 B.R. 956, 961–963 (Bkrtcy.E.D.N.Y.1983) (decision details treatment of disputed claims under section 303(h) of the Bankruptcy Code). It is clear in this instance that there is a serious dispute between

Midwest and Basin Electric as to the obligations under their contracts. Because of the dispute, the court will excuse Midwest's non-payment of the claim of Basin Electric. Nevertheless, sufficient evidence remains before the court to dictate that it find that Midwest is not generally paying its debts as they come due.

The most significant indication that Midwest is unable to meet its obligations on a current basis is its failure to pay interest on its long-term obligations. An interest payment of $2,786,062.61 was due February 28, 1984. Midwest failed to make that payment. Another interest payment of $2,786,062.61 is due on August 31, 1984. Since Midwest is not operating its crushing plant, the court cannot envision that the August 31, 1984 payment of interest will be met. Although Midwest has to this date only missed one interest payment, the missed payment is not of an insubstantial sum and there appears little hope that Midwest will be able to meet these interest payments in the future.

In addition to Midwest's failure to make interest payments on its long-term obligations, Midwest currently has pre-petition obligations to its shareholders in an approximate amount of $606,459.53. Midwest argues that its shareholders have allowed deferral of payments on those obligations, and therefore the debts are not currently due. One court has stated that it "believes that such a deferral, when made by insiders, does not preclude the non-payment of these debts from being considered in ascertaining whether an alleged debtor is generally paying its debts as such become due." *In re International Teldata Corp.,* 12 B.R. 879, 882 (Bkrtcy.D.Nev. 1981). *See also In re All Media Properties, Inc.,* 5 B.R. at 147–148 ("The fact that a debtor is not paying 'insiders' who happen to be creditors, and that those 'insiders' are not pressing for payment does not negate the fact that the debtor was not paying its debts as they become due."). In addition to deferral of the obligations to its shareholders, Midwest has received a recent cash infusion from its shareholders in an approximate amount of $300,000.00.

Tom Brokl, President of Midwest Processing Company, testified that he did not believe the cash infusion of $300,000.00 was intended to be a gift. Brokl did not know, however, how the cash infusion would ultimately be reflected on the company's books. In *In re Chong,* 16 B.R. 1 (Bkrtcy. D.Hawaii 1980), the court entered an order for relief in an involuntary proceeding where the alleged debtor's only income with which to make monthly obligations came in the form of gifts from relatives. In another decision, it was noted that "[a] company whose only payments of debts 'in the regular course of business' is with borrowed cash which creates still another liability is not generally paying its debts as they become due." *In re Central Hobron Associates,* 36 B.R. 111, 116 (Bkrtcy.D.Hawaii 1983). Although Midwest has been able to keep current on a large number of its monthly obligations, it has been only able to do so because of a deferral of payments on its obligations to its shareholders, in addition to the large infusions of cash received from its shareholders.

Outside of a large tax benefit sale, Midwest has operated at a continual loss since it began operations in 1982. Midwest has also experienced a loss of approximately $4,000,000.00 in its assets from 1982 to the end of the fiscal year 1983. Midwest is not currently operating its plant and there is no assurance that the plant will open in the near future. The court can only find, after analyzing the totality of the alleged Debtor's financial history, that the petitioning creditors are entitled to an Order For Relief.

 Midwest disputes that the petitioners are entitled to an order for relief because of alleged bad faith. Midwest raises as a defense to the order for relief allegations of bad faith. The Bankruptcy Court is a court of equity. Accordingly, parties seeking relief in Bankruptcy Court must come into the court in good faith and with clean hands. *In re Quality Trading Co., Inc.,* 36 B.R. 265, 269 (Bkrtcy.D.Hawaii 1984). Once it is established that in

some way there is bad faith connected with the involuntary proceeding, the entire proceeding is subject to dismissal. *In re Rush*, 10 B.R. 526 (Bkrtcy.N.D.Ala.1981). Bad faith is not defined under the Bankruptcy Code. *In re Grecian Heights Owners' Association*, 27 B.R. 172, 173 (Bkrtcy. D.Or.1982). It has been stated, however, that "[w]hether a party acted in bad faith is essentially a question of fact." *Camelot, Inc. v. Hayden*, 30 B.R. 409, 411 (D.E. D.Tenn.1983). The evidence submitted on the issue of bad faith should be measured by an objective test. *See In re Grecian Heights Owners' Association*, 27 B.R. at 173 ("The determination should be measured by what a reasonable person would have believed."). Accordingly, the subjective motives held by any of the petitioning creditors are not to be weighed when determining whether bad faith has been established. Previously, bad faith was found where a creditor commenced an involuntary bankruptcy proceeding on the advice of a non-lawyer. *See In re Grecian Heights Owners' Association*, 27 B.R. 172 (Bkrtcy.D.Or.1982). Bad faith was also recognized in an involuntary proceeding where the petitioners failed to disclose that they were actually debtors of the alleged debtor. *Camelot, Inc. v. Hayden*, 30 B.R. 409 (D.E.D.Tenn.1983).

■ Midwest argues in this instance that the petition for involuntary relief was initially filed in bad faith because it was not supported by the required number of petitioning creditors. It is clear that Basin Electric realized at least by the time of its meeting with Midwest officials on March 20, 1984, that Midwest had more than twelve creditors. Minutes of that meeting indicate that Basin Electric understood the need to have three supporting petitioners for an involuntary petition. Accordingly, it is evident that Basin Electric knew at the time it filed the involuntary petition that the petition was deficient because it lacked three petitioning creditors. Midwest cites as support for its position a string of decisions which have held that "[i]f the original petition was a sham, prepared with a view of being later supported by intervention of

other creditors, joinder should be denied." *In re Rite-Cap, Inc.*, 1 B.R. 740, 741 (Bkrtcy.D.R.I.1979). *See also Navison Shoe Co. v. Lane Shoe Co.*, 36 F.2d 454 (1st Cir.1929); *In re Crofoot, Neilson & Co.*, 313 F.2d 170 (7th Cir.1963); and *In re Crown Sportswear*, 575 F.2d 991 (1st Cir. 1978). A subsequent decision has noted, however, that "reliance on *Navison* and its progeny is misplaced." *In re Trans-High Corp.*, 3 B.R. 1, 4 (Bkrtcy.S.D.N.Y.1980). The cases which evolved from the *Navison* decision all were decided under the prior Bankruptcy Act. The procedures utilized and the proof required for involuntary relief under the current Bankruptcy Code have been substantially changed from those proofs and procedures utilized under the prior Bankruptcy Act. Section 303(c) of the Bankruptcy Code envisions that additional creditors may join in the petition after an involuntary bankruptcy proceeding is commenced with the same effect as if those intervening creditors had become involved in the petition at the outset of the proceedings. The bankruptcy court retains jurisdiction over an involuntary proceeding even where the action is commenced with an insufficient number of petitioners. *In re Earl's Tire Service, Inc.*, 6 B.R. 1019 (D.Del.1980). *See also In re Mason*, 709 F.2d 1313 (9th Cir.1983). This court believes that a creditor who fears his status before the debtor is rapidly deteriorating, and who is confident that it can prove the allegation that the debtor is not generally paying its debts as they come due, should be allowed to commence an involuntary bankruptcy proceeding and invoke the jurisdiction of the Bankruptcy Court. The Court can envision circumstances under which a creditor must take immediate action to preserve his interests, even where the creditor does not have the opportunity to solicit the support of additional creditors for its petition. *See In re All Media Properties, Inc.*, 5 B.R. at 134 ("[I]t is important that involuntary petitions be tried and resolved promptly because if the debtor is not paying its debts as they become due, then its creditors are entitled to the protec-

tion of their rights afforded by the Code and to prevent the debtor from wasting its assets."). This court will not require a creditor to sit on his hands and resist commencement of an involuntary proceeding where he only lacks the support of a sufficient number of petitioning creditors at a time when the petitioning creditor believes a delay will substantially injure the chances to recover on his claim. Notwithstanding the Bankruptcy Code's less restrictive requirements for commencement of an involuntary proceeding, the creditor's urge to petition for involuntary relief will be tempered by the potential for liability under section 303(i) of the Bankruptcy Code.

Court's have found bad faith where a creditor files an involuntary petition which contains allegations which the creditor knows to be false. *See Camelot, Inc. v. Hayden,* 30 B.R. 409 (D.E.D.Tenn. 1983). It follows, therefore, that bad faith would exist where a creditor alleges in his petition the existence of less than twelve creditors where he in fact has knowledge that the alleged debtor has twelve or more creditors. Midwest cannot argue in this particular matter that Basin Electric knowingly included false allegations in the involuntary petition. Basin Electric merely avoided making any allegation as to the number of Midwest's creditors. Further, the court does not believe it was necessary for Basin Electric to include in the petition an allegation as to the number of Midwest's creditors. It was only necessary that the petition include an allegation that Basin Electric was the holder of a claim against the alleged Debtor and to allege the basis under section 303(h) for its request for involuntary relief. The court has no basis for a finding that Basin Electric knowingly included false allegations in the involuntary petition.

A petitioning creditor must ultimately keep in mind the objective standard of bad faith. The issue of bad faith examines whether a reasonable person in the shoes of that petitioning creditor would have commenced the bankruptcy proceeding. Bad faith might exist where the debt-

or's financial irresponsibility is isolated to its relationship with the petitioning creditor, and that petitioning creditor commences an involuntary proceeding on a mere hunch that the debtor's financial troubles are more widespread. In this instance, Basin Electric clearly knew as of March 20, 1984, that Midwest's financial troubles were not isolated to its relationship with Basin. Further, Basin Electric has been able to gain sufficient support for its involuntary petition, and it was reasonable for Basin Electric, in light of 11 U.S.C. § 303(c), to expect it could perfect the petition after it was filed. Accordingly, the court cannot find bad faith merely from the conduct of Basin Electric wherein it filed the involuntary petition with knowledge that it needed two additional supporting petitioners.

Midwest raises as a second basis for a finding of bad faith Basin Electric's conduct in soliciting the support of two additional petitioners. It would be idealistic for this court to believe that three creditors would voluntarily travel to the bankruptcy court and meet on its doorstep with an identical purpose, to commence an involuntary bankruptcy proceeding against an alleged debtor. Creditors whose recurring monthly claims against the debtor are but a small portion of the debtor's entire financial condition, are unlikely to expose themselves to a large potential liability associated with the commencement of an involuntary bankruptcy proceeding. Although the small claimant may have great concern over its future business with the debtor, the small creditor will most likely choose to remain uninvolved merely because of the potential liability associated with the involuntary proceeding. Where a large creditor initiates an involuntary proceeding and yet needs the support of additional petitioners, it is clear that potential intervening creditors will need to be encouraged before they get involved in the proceeding. One decision has previously condoned the use of indemnity agreements to induce participation in an involuntary proceeding. *See In re Win-Sum Sports, Inc.,* 14 B.R. 389, 392

(Bkrtcy.D.Conn.1981). The use of indemnity agreements in this instance cannot therefore be viewed as conduct tainted by bad faith. The intervening creditors in this instance testified that they did not feel any undue pressure to join in the petition or that they were harassed in any manner by Basin Electric. Midwest did not submit any evidence that Basin Electric's solicitations were composed of false statements. Accordingly, the court cannot find that Basin Electric's solicitation of intervening creditors constituted bad faith.

Midwest asserts as its final basis for a finding of bad faith the motives of the petitioning creditors. Midwest asserts in particular that the involuntary proceeding was commenced by Basin Electric merely as a means to draw on a letter of credit. Midwest argues that Basin Electric has no wish to see Midwest continue its operations and in fact seeks to close the generating facility which provides Midwest its steam and water and which burns the sunflower hulls that are the by-product of Midwest's operations. It is argued, therefore, that Basin Electric's request for a reorganization of the sunflower business is an empty request. Basin Electric acknowledges that it was concerned with its loss of the security which Midwest provided through the letter of credit. Drawing on the letter of credit, therefore, was one factor which contributed to Basin Electric's general concern over the deteriorating condition of Midwest. Basin Electric asserts however that it was a general concern over the future operations of Midwest which prompted the filing of the involuntary petition. As was previously noted, bad faith is measured by what a reasonable person would have believed. *In re Grecian Heights Owners' Association*, 27 B.R. at 173. The subjective motives of a petitioning creditor are not controlling. The court cannot find that it is unreasonable that a creditor with the knowledge Basin Electric gained from its meeting with Midwest officials on March 20, 1984, would initiate an involuntary bankruptcy proceeding. Likewise, the court cannot find that it is unreasonable for an intervening creditor to rely on the initiating petitioner's ability to prove the allegations of the involuntary petition. The court can in no way find that the petitioning creditors' participation in this involuntary proceeding was prompted by bad faith.

### III.

■ Although the Court has determined that the petitioners are entitled to an order for relief in this proceeding, Midwest requests that the Court dismiss the pending petition under 11 U.S.C. § 305. Section 305 of the Bankruptcy Code provides, as follows:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension.

11 U.S.C. § 305(a)(1). Midwest asserts that a dismissal in this instance would best serve its creditors and cites two reasons to support its request for dismissal. First, Midwest's shareholders include two sizeable corporations who have historically supported Midwest with cash infusions. Second, Midwest contends that it has made great progress toward an out-of-court reorganization of its company.

The legislative history accompany § 305 of the Bankruptcy Code offers some guidance to the application of that section. That history provides:

A principle of the common law requires a court with jurisdiction over a particular matter to take jurisdiction. This section recognizes that there are cases in which it would be appropriate for the court to decline jurisdiction. Abstention under this section, however, is of jurisdiction over the entire case ... Thus, the court is permitted, if the interests of creditors and the debtor would be better served by dismissal of the case or suspension of all proceedings in the case, to so order. The court may dismiss or suspend under the first paragraph, for example, if an arrangement is being worked out by creditors and the debtor out of court, there is

no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case....

House Report No. 95–595, 95th Cong., 1st Sess. (1977) 325; Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 35, U.S. Code Cong. & Admin.News 1978, pp. 5787, 5821, 6281.

One court which has construed.the legislative history believes that section 305 of the Bankruptcy Code "contemplates the instance where a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time-consuming to start afresh with the federal bankruptcy process. *In re Lang,* 5 B.R. 371, 374 n. 4 (Bkrtcy.S.D.N.Y.1980). A majority of decisions indicate that dismissal under § 305 should be granted only in limited circumstances. *See In re Wayne's Sport Haus, Ltd.,* 27 B.R. 521 (Bkrtcy.E.D.Mich.1983); *In re New Mexico Properties, Inc.,* 18 B.R. 936 (Bkrtcy.D.N.M.1982); *In re Win-Sum Sports, Inc.,* 14 B.R. 389 (Bkrtcy.D.Conn. 1981); *In re Nina Merchandise Corp.,* 5 B.R. 743 (Bkrtcy.S.D.N.Y.1980); and *In re Luftek,* 6 B.R. 539 (Bkrtcy.E.D.N.Y.1980). The narrow use of § 305 is in large part due to the non-appealable nature of dismissals under that section. *See* 11 U.S.C. § 305(c). One court has adopted a less restrictive use of § 305 in order to encourage out-of-court work-outs, recognizing that most business arrangements result from private, negotiated settlements. *In re Colonial Ford, Inc.,* 24 B.R. 1014 (Bkrtcy.D.Utah 1982). The decision in *Colonial Ford,* however, was not rendered in the context of an involuntary proceeding.

The court cannot find in this instance that the circumstances warrant a dismissal under § 305 of the Bankruptcy Code. Rather than supporting the operations of Midwest, it is evident that Pillsbury Company is actively seeking to rid itself of Midwest's affairs. Midwest's work-out effort is best characterized by the conditional buy-out agreements proposed by Pillsbury Company. At least one unguaranteed long-term note holder had not accepted Pillsbury's buy-out proposal at the time of the hearing. Also, the conditional agreements which evidence Pillsbury's proposal are far from binding on the parties who have chosen to accept. Representatives of Midwest and its shareholders acknowledged that the processing plant will not be able to continue its operations in the future without a settlement of its differences with Basin Electric. It does not appear that such a resolution is near. The court cannot dismiss this proceeding pursuant to 11 U.S.C. § 305 when out-of-court reorganization prospects appear so dim.

Midwest has looked with disfavor on the bankruptcy system since the inception of this proceeding. This court acknowledges that it does not have answers to Midwest's substantial financial troubles. The parties concerned with Midwest's future must arrive at a solution. Bankruptcy jurisdiction does, however, insure fairness and stability to all parties who are involved in the reorganization of Midwest Processing Company. Accordingly, the court will enter an Order for Relief in this proceeding.