**In re QUALITY TRADING COMPANY, INC., Debtor.**

**Bankruptcy No. 82–00498.**

United States Bankruptcy Court, D. Hawaii.

Jan. 5, 1984.

Sherman Hee, Ronald Fujiwara, Honolulu, Hawaii, for petitioning creditors.

Harold Chu, Honolulu, Hawaii, for debtor.

## ORDER DISMISSING INVOLUNTARY PETITION

JON J. CHINEN, Bankruptcy Judge.

Joint hearings on Creditors' Involuntary Petition in Bankruptcy and Quality Trading Company, Inc.'s Motion To Dismiss Petition were heard before the undersigned Judge on May 13, 1983, May 17, 1983, September 7, 1983, October 16, 1983 and November 15, 1983. Present at the hearings were Sherman Hee, Esq., and Ronald Fujiwara, Esq., for petitioning creditors, and Harold Chu, Esq., for Quality Trading Company, Inc., hereafter "Quality".

Based on the evidence adduced, the memoranda and records on file, and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Quality, a Hawaii corporation, is in the brokerage business, representing mainland clients in the local food and spirits market.

2. Petitioners Larry Graff, hereafter "Graff", and Terri Arashiro, hereafter "Arashiro", were at all relevant times residents of the State of Hawaii. Petitioner United States Cold Storage of Hawaii, Inc., hereafter "Cold Storage", is also a Hawaii corporation, while Petitioner Astro Air Express, Inc., hereafter "Air Express", is a foreign corporation duly incorporated and authorized to do business in the State of Hawaii.

3. Sometime in 1980, Graff became associated with Quality as an officer and shareholder of the company. Originally, Graff received 41% of the common shares of Quality; but, subsequently, he acquired an additional 9% and, as of 1981, held 50% of the common shares. He also became the owner of 5% of the preferred stock, which he received from Dr. Gerald Wong, hereafter "Wong", in return for his execution of an agreement not to compete with Quality.

4. In 1981, Graff became the President and general manager of Quality. He was also a director of the company. Prior to January 1981, both Graff and Wong, treasurer of the company, signed checks on

behalf of Quality to pay Quality's bills. However, it was agreed in January of 1981 that, thereafter, all bills were to be submitted to Wong and that he was to pay the bills after they had been verified.

5. Sometime in December of 1980, it was agreed that Graff was to be paid $2000.00 a month during his employment by Quality, commencing January 1, 1981, with the understanding that payment was to be deferred until Quality earned sufficient income to make payments. While the payments to Graff were deferred, Wong agreed to make loans of $1200.00 a month to Graff, which amount was the net to Graff under the $2000.00 monthly payment.

6. In 1982, Graff was the sole employee of Quality, handling everything except the books, which were kept by Wong. Although there was an agreement that all bills were to be turned over to Wong, some bills were paid directly by Graff through company funds.

7. Quality originally had its office on Waiakamilo Road, Honolulu, Hawaii, paying rent of $300.00 per month. Some of the equipment and records of Quality, however, were kept at Graff's residence at Yacht Harbor Towers for his convenience and without charge to Quality.

8. Because of inability to pay the $300.00 monthly rent at Waiakamilo Road, Quality moved from that location at the end of July, 1981. Wong offered to store all of the records, equipment and furniture of Quality without charge in an empty room at his residence. For Graff's convenience, however, Graff chose to store some records and equipment at his place of residence at Yacht Harbor Towers.

9. Sometime in the fall of 1981, Graff moved from Yacht Harbor Towers to 1600 Ala Moana Boulevard, Suite 3504, Honolulu, Hawaii, the residence of Arashiro. Graff subsequently executed a lease with Arashiro to store some records and equipment of Quality in one of the rooms in Suite 3504 at a rent of $250.00 per month. No notice of said lease was given to Wong, who learned of the rental agreement for the first time when he reviewed Arashiro's deposition.

Wong had no access to Quality's records kept at Suite 3504, 1600 Ala Moana Boulevard.

10. Late in 1981, Wong and Graff negotiated a possible sale to Graff of Wong's interest in Quality. The negotiations, however, were unsuccessful and Wong withdrew his offer. Then, as of early 1982, communication between Wong and Graff ceased and Wong stopped advancing the loans of $1200.00 per month to Graff.

11. In February, 1982, Graff, without the approval of Wong, opened a separate bank account for Quality with City Bank and paid himself $1200.00 a month from said account.

12. Graff resigned from Quality, effective July 1, 1982. Subsequent to July 1, 1982, Graff received and retained commissions which were due Quality for services rendered to clients on behalf of Quality prior to June 30, 1982. Since July 1982, Graff has received approximately $22,000.00 in commissions on behalf of Quality.

13. Prior to the resignation of Graff, Quality represented ten manufacturers' lines, which brought in between $3000 to $4000 a month in commissions to Quality. Some of the lines were brought to Quality by Graff when he joined the company; others were developed while Graff was an employee of Quality. When Graff left Quality, some of the lines decided to join Graff, because their previous dealings had been with him; others decided to suspend doing business with Quality until the dispute between Graff and Quality had been settled. Thus, since Graff's departure, Quality has not conducted any business.

14. Subsequent to leaving Quality, Graff went into the food and beverage brokerage business in competition with Quality. As a result, on August 10, 1982, Quality brought action against Graff in the First Circuit Court, State of Hawaii, Civil No. 72832, to enforce the noncompetition agreement.

15. Creditors' Involuntary Petition was filed on September 3, 1982, alleging that Quality was not paying its debts as they became due. Ronald T. Fujiwara, the for-

mer attorney for the petitioning creditors, contended that there were fifteen creditors who were not paid as of the date of the petition.

16. Of the fifteen creditors listed, the evidence clearly shows that the following were not creditors of Quality because they had been paid as of September 3, 1982: (a) State of Hawaii, Dept. of Taxation, (b) Internal Revenue Service, U.S. Government, (c) Royal Business Machines, Inc., (d) Kaiser Hospital, and (e) First Hawaiian Bank.

17. The evidence further shows that the following creditors had not presented their bills to Wong as of September 3, 1982: (a) Air Express (which did not present its bill to Wong until Wong's deposition on January 22, 1983); (b) Wong, (c) Attorney Warren Higa, and (d) Arashiro. Thus, as of said date, their bills were not due and owing.

18. The evidence also shows that the following creditors were paid after their bills had been verified by Wong:

(a) Hawaiian Telephone. A delay in payment of the telephone bill often occurred because Graff also used the telephone for his personal calls and Wong had to verify the calls made on behalf of Quality before payment,

(b) Bishop Insurance of Hawaii, Inc.

(c) Roy's Kam Center Texaco Service. After an automobile had been turned over to Roy's Texaco Service, no further bill was submitted.

19. The evidence shows that the claim of Hawaii Typesetter for $52.00 had not been paid as of September 3, 1982, because Graff said he would take care of this bill.

20. As for the claim of Cold Storage for $441.00, Mr. G. Morita of Cold Storage testified that, at the beginning of 1982, Wong said he would pay the amount owing, but, as of September 3, 1982, the bill was not paid. The Court finds this bill due and owing as of September 3, 1982.

21. The testimony also shows that the bill of Air Express for $181.73 was due and owing as of September 3, 1982.

22. Graff claims that he is entitled to his salary of $2000.00 per month for the year 1981 and for the first six months of 1982.

23. Quality, however, claims certain set-offs against Graff as follows:

(a) Graff is in possession of certain furniture and equipment of Quality valued at $1700.00. Though requested to return the furniture and equipment, Graff has failed to do so.

(b) Graff has deposited into a special City Bank account $12,000.00 belonging to Quality which he had received as commissions for services rendered prior to July 1982. Graff also has another $10,000.00 belonging to Quality for which Graff has not accounted.

(c) Warren Higa did some personal work for Graff worth about $2000.00. Mr. Higa informed Wong that he was assigning to Quality his claim against Graff for $2000.00.

(d) Wong testified that he has assigned to Quality his claim against Graff for loans advanced to him.

24. Since Graff left, Quality has received no income. Wong has been covering the bills which he has verified by depositing money in Quality's checking account and paying the bills through said account.

## CONCLUSIONS OF LAW

Under Section 303(b) of the Bankruptcy Code, three or more creditors must join in an involuntary petition unless there are less than twelve creditors, in which case a single creditor may file. The petitioning creditors must have unsecured, noncontingent claims in the aggregate amount of $5000.00. Petitioners herein are comprised of four separate creditors, Graff, Arashiro, Cold Storage and Air Express who contend that they have claims in excess of $5000.00 which are unsecured and noncontingent.

Where the debtor timely controverts the petition, the Court shall order relief if it determines that "the debtor is generally not paying such debts as such debts become due", section 303(h)(1). If the requirements are met, it is mandatory that the court grant relief to the creditors. *In Re Duty*

*Free Shops Corporation,* 6 B.R. 38 (Bkrtcy. S.D.Fla.1980).

Of the fifteen creditors originally listed, five did not have valid claims at the date of the Involuntary Petition because they had been paid, three were paid after their bills were verified by Wong, and four, including Arashiro, had made no demand on debtor at the time of the Involuntary Petition. Thus there were fewer than twelve creditors. It is sufficient, therefore, if there is one petitioning creditor provided that the other requirements of Section 303(b) are satisfied.

The four Petitioning Creditors were Air Express, Cold Storage, Arashiro and Graff. It is undisputed that Air Express and Cold Storage had valid claims against Quality as of September 3, 1982 in the sums of $181.73 and $441.50, respectively. The Court finds, however, that the claims of Arashiro and Graff should not be recognized, because both have filed the petition in bad faith and have come into the bankruptcy court with unclean hands.

■ The bankruptcy court is a court of equity. 28 U.S.C. Sec. 1481. As such, a person seeking relief in bankruptcy court must come into court in good faith and with clean hands. Furthermore, the bankruptcy court has inherent power to look into the good faith of any petitioning creditor. *In Re G–2 Realty Trust,* 6 B.R. 549, 2 C.B.C.2d 1344 (Bkrtcy.D.Mass.1980).

■ *Arashiro's claim against Quality:* The Court finds the lease arrangement which forms the basis of Arashiro's claim to be a collusive attempt between Arashiro and Graff to create a claim against Quality.

When Graff moved into Arashiro's residence at 1600 Ala Moana Boulevard, he knew that Quality had vacated its office at Waiakamilo Road because of its inability to pay rent of $300.00 per month. Nevertheless, Graff executed a lease with Arashiro for a room to store a portion of Quality's records, furniture, and equipment at $250.00 a month, even though he had been told that there was rent-free space available at Wong's residence.

No demand for payment of the lease rent was made on Wong prior to initiation of the Involuntary Petition. Furthermore, Wong was not notified of the existence of said lease until after the Involuntary Petition had been filed.

This Court thus finds that Arashiro's claim is made in bad faith and as such the Court refuses to recognize said claim in determining whether the requirements of § 303(b) are satisfied.

■ *Graff's claim against Quality:* The Court finds Graff's conduct to be doubly tainted. After severing his relationship with Quality, Graff continued to collect and retain commissions earned by Quality prior to July 1, 1982. As a result, Quality has had no income since July of 1982, which has prevented Quality from paying its creditors. Graff also has in his possession certain records, furniture and equipment of Quality which he has refused to turn over to Wong. The Court thus finds that Graff has brought this petition in bad faith and will not include his claim to determine whether the petitioning creditors meet the requirements of § 303(b).

■ Moreover, even if the Court did include Graff's claim in determining whether the necessary requirement of § 303(b) had been satisfied, it would find that his claim is subject to a total offset. Graff has received commissions, totalling approximately $22,000.00, which properly belong to Quality and for which Graff has failed to account. In addition, Graff holds equipment and furniture belonging to Quality valued at approximately $1,700.00. Graff therefore owes Quality $23,700.00. Quality, on the other hand, only owes Graff his salary for the year 1981 and for the first six months of 1982. The amount owing to Graff would conceivably be $36,000.00, since Graff was earning $2,000.00 a month, but this amount is subject to further offset. For the year 1981, Quality owes Graff only $800.00 a month, or a total of $9,600.00, because Wong had assigned to Quality his claim against Graff of $1,200.00 a month. Furthermore, since Graff was paying himself $1,200.00 a month as of February 1982,

Quality owes Graff $2,000.00 for January and $800.00 a month from February to June, 1982. In addition, Warren Higa's claim against Graff for $2000.00 has been assigned to Quality. The total amount then owing is $13,600.00. In conclusion, Quality does not owe Graff any money. Instead, Graff appears to be indebted to Quality.

Based on the foregoing, the Court finds that the claims of Arashiro and Graff cannot be included in satisfying the standing provisions of § 303(b) for petitioning creditors. The claims of the remaining petitioning creditors Air Express and Cold Storage do not satisfy the requirement of § 303(b) that the total claim aggregate at least $5000.00. Even if the standing requirements of § 303(b) were met, the petitioning creditors have not met the requirements of § 303(h) in demonstrating that Quality was not paying its debts as they became due. The Court thus finds that the Involuntary Petition herein does not meet the requirements of Section 303 and hereby dismisses said petition.