**In re VINCENT J. FASANO, INC.**
**Alleged Debtor.**

**In re DJF REALTY AND SUPPLIERS,**
**INC. Alleged Debtor.**

**In re VINCOL CONSTRUCTION CO.,**
**INC., Alleged Debtor.**

**Bankruptcy Nos. 82–00766 to 82–00768.**

United States Bankruptcy Court,
N.D. New York.

June 27, 1985.

Menter, Rudin & Trivelpiece, P.C. (Gerald J. Mathews, of counsel), Syracuse, N.Y., for petitioners.

Goldberg, Harding & Talev (Harold P. Goldberg, of counsel), Syracuse, N.Y., for Alleged Debtor.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

LEON J. MARKETOS, Bankruptcy Judge.

On May 18, 1982, the Petitioners, United States Fidelity & Guaranty Company (hereinafter, USF & G), Edward Schalk & Son, Inc. (hereinafter, Schalk), and Tel Systems Management Corp. (hereinafter, TSM), filed with the Court involuntary bankruptcy petitions against Vincent J. Fasano, Inc. (hereinafter, Fasano, Inc.).

In addition, USF & G filed involuntary bankruptcy petitions against the following:

1. DJF Realty and Suppliers, Inc. (hereinafter, DJF);
2. Vincol Construction Company, Inc. (hereinafter, Vincol);
3. Vincent J. Fasano, personally (hereinafter, V. Fasano); and
4. Mary D. Fasano, personally (hereinafter, Spouse).

An order consolidating the above cases was entered on June 15, 1982.

The issue presently before the Court is whether an order of relief should be entered against Fasano, Inc., DJF and Vincol within the purview of § 303(h), Title 11, U.S.C. (hereinafter, the Code). Fasano, Inc., DJF and Vincol (collectively, the Alleged Debtors) by their attorney filed answers which deny the pertinent allegations of the petitions and assert counterclaims for costs, fees and both actual and punitive damages, alleging the petitions are groundless, fraudulently and recklessly filed, as well as not filed in good faith. Further, DJF and Vincol assert as an affirmative defense that each has greater than twelve creditors.

A motion to allow an additional creditor, Custom Environmental Systems, Inc. (hereinafter, Custom) to join the Fasano, Inc. petition was filed on November 21, 1984. After a hearing on the merits, the Court granted Custom permission to join the involuntary case as a petitioning creditor.

A hearing on the Petitioners' request for an order of relief was held on November 26th through the 29th, 1984. The lead petitioning creditor, USF & G, submitted voluminous amounts of testimony and documentary evidence in support of its position. At the close of Petitioners' evidence, Counsel for USF & G reserved the right to recall Stephen Trecker (hereinafter, Trecker), senior claims manager for the Northeast Division of USF & G to testify as to petitioning creditor Schalk's claim only. After Petitioners rested, the Alleged Debtors moved for dismissal of the petitions on the grounds Petitioners failed their burden of proof and rested without submitting any evidence.

Thereafter, the Alleged Debtors filed a motion to reopen its case to call a rebuttal witness, Thomas G. Heckel (hereinafter, Heckel) superintendent of claims for USF & G as to its treatment of Schalk's Miller Act, 40 U.S.C. § 270a *et seq.*, bond claim. After a hearing, the Court granted said request.

After thorough consideration of the evidence as submitted at trial and the briefs of the parties, the Court finds the relevant facts to be as follows:

### FINDINGS OF FACT

Fasano, Inc. is a large general contractor engaged in the construction of a majority of public construction projects along with some commercial and residential buildings in New York and Florida (hereinafter, the Northern and Southern Division, respectively). Vincol and DJF are wholly owned subsidiaries of Fasano, Inc., which conducts all their business with the parent company, Fasano, Inc. DJF and Vincol receive all their income and provide all services to Fasano, Inc. only. DJF owns construction equipment and a cement plant and Vincol is involved in maintaining labor contracts in behalf of the parent company. Neither Vincol or DJF have any accounts receivable or income from any entity other than Fasano, Inc.

In early 1982, Fasano, Inc. had the following major projects in operation:

NORTHERN DIVISION

1. Fort Drum Barracks complexes, Black River, New York;

2. Centro Syracuse Bus Garage, Syracuse, New York;

3. Parking garage at Hancock Airport, Syracuse, New York;

4. Cruise Missile Storage Facility at Griffiss Air Force Base, Rome, New York;

5. Salmon River Fish Hatchery, Altmar, New York.

SOUTHERN DIVISION

1. Florida International University-Dormitory North Miami, Florida;

2. Stewart Arms Apartments, Florida;

3. Metro Dade County University Rail Stations, Florida;

4. Broward County Jail, Florida; and

5. Broward County College, Florida.

Performance and payment bonds were required for most construction projects undertaken by Fasano, Inc. There has been a long standing relationship between Fasano, Inc. and USF & G whereby the latter would supply needed Bonds on the former's projects.

During the pertinent time periods, V. Fasano was the President and Spouse was the Secretary of the Alleged Debtors.

On February 23, 1976, V. Fasano, as President, and Spouse, as Secretary to the Alleged Debtors, executed a Master Surety Agreement (hereinafter, MSA) in favor of USF & G (Exhibit 15). In addition, USF & G obtained the personal guarantees of both V. Fasano and Spouse. The MSA provides the Alleged Debtors and guarantors agree to indemnify USF & G, which acted as surety for Fasano, Inc.'s construction projects, for any and all expenses or losses incurred by USF & G as a result of its fulfillment of the payment and performance bonds executed between the parties.

The majority of Fasano, Inc.'s financial problems can be traced to its work on the Metro Dade County University Station Contract (hereinafter, MDC Project). Apparently, Fasano, Inc. was contracted to construct several rail stations in Florida. At some point during construction, numerous disputes arose between Fasano, Inc. and MDC as to the mode of construction. In addition, it appears MDC suffered internal disputes among its own consulting engineers. In any event, these disputes necessitated a large number of changes and alterations to the original contract and naturally, construction delays followed.

In January 1982, William McDaniel, an official from MDC, sent a letter (Exhibit 44) to Heckel at USF & G. The letter reaffirmed MDC's concern, ostensibly set forth in a prior correspondence, regarding subcontractors' claims which were not paid

by Fasano, Inc. In addition, the letter stated that although Fasano, Inc. assured MDC said claims would be paid, MDC was concerned because this appeared to be a recurring problem.

Thereafter, it is unclear whether Fasano, Inc. remedied the problems; however, MDC issued a project termination notice to Fasano, Inc. demanding same to vacate the project. (Exhibit 45).

Fasano, Inc. contends this termination was completely improper because it claims the delays were occasioned by MDC itself. Fasano, Inc. alleges it has a breach of contract action against MDC for in excess of $3,000,000.00.

After Fasano, Inc. was terminated from the MDC project, MDC sought reimbursement from USF & G as surety for the costs of completion of the project. In fulfilling its bond obligations, USF & G received bids on the job and accepted the low bidder who completed the job. In addition, there is a pending law suit by MDC against USF & G seeking additional completion costs of the project.

At approximately the same time, problems started to occur on the Centro Syracuse Bus Garage project (hereinafter, Centro Job). At or around March 4, 1982, the Regional Transportation Board of Syracuse, which was in charge of the Centro Job, wrote a letter (Exhibit 49) to Heckel at USF & G stating its concern that certain subcontractors were paid by Fasano, Inc., with bad checks. The letter continued that as Fasano, Inc. had already been paid a substantial amount of progress payments, the Board was concerned that its payments to Fasano, Inc. were being misappropriated. The letter stated further that the purpose of the letter was to inform USF & G of potential problems and to request its assistance in curing said problems.

A follow-up letter (Exhibit 46) was sent to Heckel on March 20, 1982. It stated that Fasano, Inc.'s Centro Job contract had been terminated (Exhibit 47) and that the Authority looked to USF & G as surety to perform and complete the contract.

Trecker stated that after the Centro Job was terminated, USF & G hired Consultant Management Associates (hereinafter, CMA) to help sort out the problems of the Centro Job and other Fasano, Inc. jobs as the claims and law suits were starting to come in daily.

The terminations on the above two projects started a chain reaction of defaults, nonpayments and project cancellations on several more Fasano, Inc. jobs pending in early 1982. For example, termination notices were issued by Fasano, Inc. on the Florida International University Job (Exhibit I) on April 5, 1982 and on the Hancock Airport Parking Garage (Exhibit J) on April 5, 1982. These letters advised that as USF & G invoked the provision of the MSA giving the bonding company the right to complete the projects, although Fasano, Inc. objected, USF & G's action "has effectively prevented us from continuing in our performance of these jobs".

Trecker testified that at this time in early 1982, USF & G became inundated with subcontractor claims from numerous Fasano, Inc. jobs. Moreover, he stated he received a letter (Exhibit 18) dated March 12, 1982 from Fasano, Inc. requesting immediate financial assistance as the corporation was "not in a position to meet its financial obligations . . ."

Fasano, Inc. wrote several other letters to USF & G requesting assistance in paying its subcontractors and in completing projects, including a letter written on March 18, 1982 setting forth a list of immediate cash requirements (Exhibit 35) to pay twenty-four creditors, suppliers and subcontractors in the approximate amount of $739,299.95. In addition, a telegram dated March 25, 1982 was received by USF & G from Fasano, Inc. requesting two subcontractors be paid in excess of $40,000.00. Further, another list of urgent cash requirements was sent on March 29, 1982 requesting payments in excess of $539,-000.00 be paid to subcontractors on the Florida International University job. Finally, several other requests for financial as-

sistance on specific jobs were sent to USF & G in early 1982.

At the same time, V. Fasano, Trecker, Heckel and other USF & G representatives met to discuss the financial situation of Fasano, Inc. At this meeting, V. Fasano explained the problems related to the MDC project and requested financial assistance through loans to enable Fasano, Inc. to survive the cash flow shortage. USF & G advised Fasano, Inc. that it would bring in CMA to analyze the situation, and then it would make its decision accordingly.

After the meeting, Fasano, Inc. sent another letter to Trecker (Exhibit D) stating that after reviewing his corporation books and records, he is confident that with a little financial assistance provided by USF & G, Fasano, Inc. can survive its current problems. In addition, the letter reiterates Fasano, Inc.'s position that MDC wrongfully terminated the MDC Project and that Fasano, Inc. will pursue its breach of contract action against MDC for at least $2,000,000.00. The letter continues and notifies USF & G that Fasano, Inc. has rejected MDC's termination and notified its subcontractors to stay on the job. Finally, the letter alludes to the former letter dated March 12, 1982 (Exhibit 18) sent to USF & G which requested financial assistance because the corporation was not in a position to meet its financial obligations and states that said request was only referring to the financial difficulties encountered on the MDC Project and not to any inherent financial problems of Fasano, Inc. itself.

On March 26, 1982, Trecker sent a letter (Exhibit E) to Fasano, Inc. effectively advising that USF & G rejected its request for loans and financial assistance. Moreover, the letter stated that the investigation established USF & G's exposure to liability was at least $4,000,000.00 under the payment and performance bonds. Therefore, it continued, pursuant to the MSA, USF & G was making demand for indemnification for at least $4,000,000.00 from V. Fasano, Spouse and the Alleged Debtors in the form of property or security interests of value.

On March 30, 1982, Fasano, Inc. sent a letter to USF & G (Exhibit C) advising that its failure and unwillingness to assist and support Fasano, Inc., pursuant to the several requests for financial assistance made heretofore in early 1982, have contributed to Fasano, Inc.'s hardships. In fact, the letter provides that USF & G's delay in paying claims under the bonds caused the subcontractors on the Centro Job to walk off which was the basis of the owner's contract termination and that Fasano, Inc. holds USF & G responsible for the consequences of its delay.

In addition, the letter states that USF & G's inaction effectively reinforced the owners' decisions to terminate several contracts. Further, the letter states that USF & G's inaction is forcing Fasano, Inc. out of business. Finally, the letter sets forth a proposal through which the Alleged Debtors would assist USF & G in completing all jobs and actively support all litigation in exchange for USF & G's financial assistance to keep the Alleged Debtors viable. This offer was denied by USF & G and Fasano, Inc. was unable to obtain any outside financing to keep it in operation.

After this last rejection of assistance by USF & G occurred in approximately early April 1982, the Alleged Debtors were essentially out of business as under the terms of the MSA, they were required to turn over all contract funds and income from projects to USF & G.

On April 14, 1982, USF & G, through Trecker, sent Fasano, Inc. another letter (Exhibit 22) revising its indemnity request upward from $4,000,000.00 to $5,000,000.00 as additional investigation established USF & G's bond liability was increasing daily. Meanwhile, sub-contractor claims continued to be served on USF & G.

Trecker stated it was not customary for USF & G to provide financial assistance to a failing contractor. However, he indicated each situation is unique and had to be evaluated on its own facts. Trecker stated the following reasons for denying Fasano, Inc.'s request for aid:

1. At the meeting in March 1982, V. Fasano informed Trecker he could pledge unencumbered assets of substantial value as security for financial assistance such as two expensive racing boats, two Mazzeratis, a Syracuse office building and his personal residence. However, after the consultant investigated the pledged property for outstanding liens, it found third party liens against almost all the equity of the collateral; and

2. Trecker stated that although he made several requests for appraisals on the proposed collateral, none was received prior to the petition.

USF & G submitted copies of judgments filed against Fasano, Inc. in early 1982 (Exhibits 65–65E) in the aggregate amount of approximately $795,000.00.

Moreover, USF & G submitted Exhibit 25 which is a record comprised by USF & G from review of Fasano, Inc.'s books and records which showed an outstanding balance due on all jobs as of the petition date of approximately $2,609,335.00. In addition, USF & G submitted a business record obtained from Fasano, Inc.'s files which shows as of March 12, 1982, a total outstanding debt on the Northern Division jobs alone was approximately $982,771.00.

Kenneth Richardson (hereinafter, Richardson), Fasano, Inc.'s former controller for the Northern Division jobs, testified in behalf of USF & G. He testified he was in charge of the books and records of the Alleged Debtors. In addition, he stated that after he left Fasano, Inc.'s employment in the Spring 1982, he went to work for USF & G to help it investigate Fasano, Inc.'s financial picture.

He confirmed the difficult financial posture of Fasano, Inc. which occurred after the CMA problems developed in early 1982. He stated that Fasano, Inc., as of February 1982, had at least $2,500,000.00 in total outstanding debts. However, upon conducting a more thorough review and audit after he left the employ of Fasano, Inc. and started working for USF & G, he discovered the total outstanding balance after all income from jobs was subtracted, was at least $3,400,000.00 on the Northern Division jobs alone as of May 1982. (Exhibit 73).

Richardson testified to the grave financial status of Fasano, Inc. in early 1982. For example, he stated Fasano, Inc. could obtain no outside financing from banks or third parties and that no payments on already existing loans were made during March or April 1982. He testified that during early 1982 even Fasano, Inc. employees were not being paid. It was his firm opinion that Fasano, Inc. was not paying its debts as they were becoming due as of the date of the petition, May 18, 1982.

Richardson stated further that prior to the serious financial problems which occurred in March 1982, he was personally concerned with the accuracy of the financial figures as entered into Fasano, Inc.'s books and records. He stated that he believed V. Fasano was personally taking out of Fasano, Inc. about $500,000.00 to $700,000.00 per annum.

In support of his position that things were amiss, Richardson stated that in March 1982, a progress payment in the amount of $400,000.00 came into the offices from the MDC job. He explained how the money was sent through an elaborate depositing scheme whereby it was deposited and withdrawn from several different banks on consecutive days and then eventually it was deposited into Landmark, Inc., a new corporation set up by V. Fasano at about this time. He stated that these transfers occurred essentially after Fasano, Inc. had ceased operations. On cross-examination, Richardson conceded that some of the money, although he did not know how much, was eventually paid to subcontractors' claims.

Richardson stated that Vincol and DJF had no outside accounts with any entity except Fasano, Inc. He testified that neither Vincol or DJF could pay their debts as they came due because there was no income whatsoever from Fasano, Inc. as it was not paying its debts either.

Richardson stated that finances were so tight at Fasano, Inc. that in early 1982, it was only paying subcontractors who were needed on the jobs.

Richardson stated it was the custom in the construction industry to show a loss on the books during the winter months as usually the inclement weather forced slow downs on jobs. He stated, of course the Southern Division suffered no problems in this regard. He explained that Fasano, Inc. had high overhead throughout the year as it was always paying people to research and compile bid packages for future potential jobs. Further, he testified he could remember throughout his employment with Fasano, Inc. that during the winter months, subcontractor claims would not be paid for months, might actually never be paid, but that the same subcontractor would work again for Fasano, Inc. on a new job.

Richardson stated that as controller he would review the books and when debts became very high, he would bring it to V. Fasano's attention who would usually infuse new capital from bank loans or personal assets into the corporation. He remembered several past occasions when V. Fasano infused large amounts of his own money into the corporation. In fact, he stated he remembered at least once when V. Fasano paid $100,000.00 of his personal assets into Fasano, Inc.

Finally, he stated it was industry custom that when the general contractor was not paid, neither were the subcontractors. He also stated that he was fired several times by V. Fasano.

John Schalk (hereinafter, J. Schalk), testified in behalf of the petitioning creditor Schalk. He stated his company installed interior dry walls on the Griffiss Air Force Base project. According to his testimony, Schalk is owed $2,509.35 and that the last work performed was on or around May 18, 1981. He indicated that in January or February 1982, he spoke to Richardson at Fasano, Inc.'s offices who assured him his claim would be paid. However, it was not.

J. Schalk testified the original contract amount was $15,870.00 but there were several change orders which raised the contract price to $19,929.35, plus $454.35 which was apparently work performed, but through bookkeeping oversight, was unbilled. He stated he received partial payment and that the total due now was $2,509.39.

Schalk submitted a letter dated April 2, 1982 (Exhibit L) to USF & G demanding payment of the debt. The letter states the claim is made against the Miller Act payment bond.

J. Schalk stated further that he was contacted in early May 1982, around the 9th, by Gerald Mathews, (hereinafter, Mathews), USF & G's attorney about becoming a petitioning creditor in the involuntary case against Fasano, Inc. He stated Mathews informed him that by joining the petition he might collect his debt. Mathews and his firm had represented Schalk on some previous matters unrelated to the instant case. J. Schalk stated he knew Mathews represented USF & G at the time of their initial conversation. In addition, after the petition was filed, J. Schalk contacted USF & G and received an indemnity agreement as J. Schalk was concerned about possible liability arising from Fasano, Inc.'s counterclaim for damages.

In an examination before trial taken on March 16, 1982, J. Schalk admitted the only reason he was a petitioning creditor was to collect his debt. (EBT Pg. 32, lines 19–22).

He indicated he had no personal knowledge as to whether Fasano, Inc. was paying its debts, although J. Schalk stated he learned of Fasano, Inc.'s financial troubles through talk in the industry.

Finally, J. Schalk stated that although he submitted a payment demand letter to USF & G in early April 1982, he received no response and failed to follow up on the claim until he was contacted by Mathews in early May 1982.

Phillip Klein (hereinafter, Klein), the owner of Custom, another petitioning creditor in the involuntary case against Fasano, Inc., stated his company performed mechanical contracting work on the Fort

Drum project, at first as a subcontractor to O'Shea Electric, and later directly for Fasano, Inc. to finish punch work which O'Shea failed to complete. He stated Custom is owed $3,319.00 by Fasano, Inc. but was unable to produce any invoices. However, submitted as evidence was Exhibit 23, the account payable ledger from Fasano, Inc.'s records which indicated Custom is owed the above referenced amount.

Klein stated, on cross-examination, that he had no information as to whether Fasano, Inc. was paying its debts. In addition, he provided that his company is currently in financial difficulty and in default on some projects. Further, he stated USF & G is Schalk's bonding company. Finally, he testified he failed to pursue payment from USF & G on its bond.

Victor E. Basile, Jr. (hereinafter, Basile) testified in behalf of the last petitioning creditor, TSM. He stated TSM provided long distance telephone service to Fasano, Inc. and the outstanding debt owed TSM was $808.67.

On cross-examination, Basile, first, admitted, he no longer worked at TSM. Second, he stated he did not know if any payment has been made on the debt. In addition, he testified that he thinks TSM is out of business. He stated further that his motive for joining the petition was to collect the debt. Finally, he stated he had no knowledge as to whether Fasano, Inc. was paying its debts.

## DISCUSSION

Although courts have been unable to arrive at a uniform standard for ascertaining what constitutes a failure to pay one's debts as they generally become due, the Court finds in the instant case that as of the date of the petition, Fasano, Inc. was not paying its debts as they became due in accordance with § 303(h)(1) of the Code.

In its post-trial brief, Fasano, Inc. does not dispute this point. Moreover, the Court finds sufficient proof in the record to demonstrate that DJF and Vincol were not generally paying their debts as they were coming due either. Code § 303(h)(1). Al-

though the proof in this regard is not nearly as compelling and complete as in Fasano, Inc.'s situation, the evidence clearly revealed that Vincol and DJF derived all their business from Fasano, Inc. Therefore, as Fasano, Inc. clearly was not paying its debts, it is a proper and logical inference that Vincol and DJF were not paying their debts either.

Fasano, Inc. asserts there are an insufficient number of petitioning creditors to support the instant involuntary proceeding. The requirements, in pertinent part, to commence an involuntary petition under § 303(b) are as follows:

(b) An involuntary case is commenced by the filing ... of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability ... if such claims aggregate at least $5,000.00 more than the value of any lien on property of the debtor securing such claims held by the ... [Petitioners];

(2) if there are fewer than 12 such holders, ..., by one or more such holders that hold in the aggregate at least $5000.00 of such claims;

In this case there is no question that Fasano, Inc. has more than twelve creditors. Therefore, pursuant to Code § 303(b)(1), three or more creditors must join and qualify as petitioners in the involuntary petition against Fasano, Inc.

With regard to DJF and Vincol, although in their answer both entities allege the existence of more than twelve creditors, no proof was submitted on this point besides a list of thirteen creditors annexed to their respective answers. However, there appears to be no serious dispute as DJF and Vincol failed to raise the point in their post-trial briefs and thus the Court will find both DJF and Vincol have less than twelve creditors. Therefore, under Code § 303(b)(2), only one petitioning creditor need file the involuntary petitions.

Fasano, Inc. argues there are less than three petitioning creditors for numerous reasons, many of which involve the allegation that the filing of the petition is wholly lacking in good faith.

For purposes of clarity, the Court will first consider the defenses as against Fasano, Inc. only.

■ Fasano, Inc. avers that there are less than three petitioning creditors who qualify to participate in the petition. Code § 303(b)(1) requires the three petitioning creditors against Fasano, Inc. to hold claims as of the date of the petition. 2 COLLIER ON BANKRUPTCY ¶ 303.08[1], p. 303–26 (15th ed. 1985). Section 101(4) establishes a claim is a right to payment whether matured or unmatured. The four petitioners who testified at the trial were: USF & G, Schalk, Custom and TSM. First, Fasano, Inc. avers TSM failed to prove it held a claim against it on the date of the petition. The Court finds TSM's proof of a claim against Fasano, Inc. wholly incomplete and insufficient.

Basile, the former controller for TSM, testified that he does not know if payment was ever made by Fasano, Inc. on the debt. In addition, Basile stated he does not even work for TSM. Basile stated further that at the time he signed the petition, he knew nothing about whether Fasano, Inc. was paying its debts. Essentially, Basile testified he signed the petition with no information or understanding as to what an involuntary bankruptcy was. The Court will waste little time with TSM. It is clear that TSM has not qualified to be a petitioning creditor in this case against Fasano, Inc. as it has failed to prove a claim existed as of the petition date. Therefore, TSM will be disqualified from the petition.

Next, Fasano, Inc. asserts Custom failed to prove it has a valid claim as of the date of the petition. Fasano, Inc. does not dispute Klein's testimony that after O'Shea, the general contractor defaulted on the Fort Drum job project, Custom finished the job. However, Fasano, Inc. contends that although Klein testified Custom has not been paid its debt of $3,319.00, Klein per-

formed work on other jobs such as the Griffiss job and he was unable to produce any invoices to support its claim of a debt due for the Fort Drum work.

Klein also testified that Custom did not pursue payment under its bond against USF & G because V. Fasano personally promised to pay the debt and his assurances had been reliable in the past. However, Fasano, Inc. suggests that as Custom is itself in financial difficulty, and USF & G is its bonding company, Custom decided it was better not to pursue its bond claim against, in reality, its *own* bonding company.

In response, Counsel for USF & G submitted Exhibit 23, an accounts payable ledger of Fasano, Inc. A review of Exhibit 23 shows "WO # 1681" is owed $3,319.00, but it fails to identify the creditor or what job the money is owed on. Fasano, Inc. refers to Klein's testimony that Custom also performed work on the Griffiss job. Further, Fasano, Inc. refers to Exhibit K which is a sworn affidavit of Trecker submitted in an earlier proceeding in this case involving a dispute between USF & G and a secured creditor as to certain contract retainage held from the Griffiss job. In any event, Fasano, Inc. refers to an exhibit attached to Exhibit K which certifies that Custom was paid by USF & G $4,897.00 for the work performed on the Griffiss job. Fasano, Inc. states Exhibit K establishes Custom was paid and the $3,319.00 claim was just a lesser included portion of the larger Griffiss payment.

Custom asserts further support that it has an outstanding claim on the Fort Drum project is exhibited through Exhibit 73, which is a "spread sheet" put together by CMA with the assistance of Richardson after he left the employment of Fasano, Inc. in the spring of 1982. Although Counsel for USF & G asserts there is evidence of Custom's debt listed on page 7 of the Account Payable Control Sheets of the Fort Drum project, the Court has scrutinized same and fails to find any debt listed as owed to Custom. Apparently, USF & G is referring to the account balance listed in

the amount of $72,434.50 which is owed to O'Shea Associates; however, the Court is unclear as to USF & G's point.

In further support of Custom's claim, USF & G points to Trecker's testimony from Exhibit 68, which is the Accounts Payable Trial Balance on the Northern Division jobs as of April 13, 1982, in which Trecker stated he could identify Custom's debt in the amount of $3,319.00 listed thereon. The Court has also reviewed same; however, it notes again, although the amount of the debt is listed, there is no indication as to what job the debt is related to.

Fasano, Inc. asserts the above circumstantial evidence as to the alleged claim against Fasano, Inc. on the Fort Drum project is insufficient to qualify Custom as a petitioning creditor in this case. In further support of its position, Fasano, Inc. also refers to Klein's testimony that he has no information as to whether Fasano, Inc. was generally paying its debts as they became due.

In response, Counsel for USF & G argues that although Exhibit K shows a payment made to Custom on the Griffiss job of $4,897.00, obviously, this amount is not the $3,319.00 that is owed to Custom on the Fort Drum project.

■ The Court finds the proof as to the existence of Custom's claim against Fasano, Inc. to be questionable. In review of the evidence, the Court is unable to find any direct documentary evidence which ties the $3,319.00 claim to the Fort Drum job. The only proof the Court has presently before it is Klein's testimony that the claim is due for work performed on the Fort Drum job. The Court finds that as Klein's testimony was not contradicted nor challenged on cross-examination, the Court will accept it as true and find that Custom proved it had a claim against Fasano, Inc. as of the petition date. Therefore, the Court finds Custom qualifies as a petitioning creditor.

Fasano, Inc. next argues that the petition for involuntary relief was filed in bad faith because of USF & G's motives, evidenced, in part, by the method of solicitation used by USF & G to obtain petitioning creditors to participate in the petition. Specifically, Fasano, Inc. refers to the mode of solicitation of Schalk's claim.

■ Code § 303 contains no express requirement of good faith on behalf of petitioning creditors. However, the Bankruptcy Court is a court of equity and, accordingly, parties seeking relief in the court must enter it in good faith and with clean hands. *In re Quality Trading Co., Inc.* 36 B.R. 265, 269 (Bankr.D.Hawaii 1984); *In re Midwest Processing Co.,* 41 B.R. 90, 101 (Bankr.D.N.D.1984). The Code contains no definition of bad faith. However, whether bad faith exists is a question of fact. *Id.* In addition, the evidence submitted on the issue of bad faith should be measured through an objective, rather than a subjective, standard. *See In re Grecian Heights,* 27 B.R. 172, 173 (Bankr.D.Or.1982).

In support of its bad faith argument, Fasano, Inc. points to Exhibit K which is the Trecker affidavit previously referred to. Attached thereto as an exhibit is a payment schedule which sets forth all the claims paid by USF & G on the Griffiss Job. Listed as paid in May 1982 on page one of the schedule is Schalk's claim of $2,509.35. After the case was reopened, Trecker was put on the stand to explain this apparent discrepancy. Trecker stated that originally, after Schalk's claim letter came into USF & G in early April 1982, there was a draft directed to be issued. However, for reasons unknown to Trecker, payment was never actually made to Schalk.

Fasano, Inc., after receiving the order reopening the case, supboened Heckel, now retired, who was the claims manager for USF & G during the early spring 1982, and all records pertaining to subcontractor claims made against USF & G on the Griffiss job. Heckel brought several subcontractor claim files to the trial.

Counsel for Fasano, Inc. inquired as to the general procedure USF & G used at the

time in processing claims. Heckel stated that the ultimate decision regarding payment of subcontractor claims rested with him. He provided further that during March, April and May 1982, the number of claims coming in from Fasano, Inc. jobs was staggering. Therefore, USF & G hired CMA to help process and analyze subcontractor claims.

Generally, Heckel stated that after a claim was received, USF & G would send an acknowledgement letter to the claimant asking for proof of performance, as usually no invoices were sent with the claim letter. Next, he would attempt to verify completion of the work with the general contractor. Thereafter, if everything checked out, Heckel would authorize a draft which would be issued directly from the regional office. The original draft would be issued to the payee with one copy going to the home office, in Maryland, for its files. Heckel explained that the drafts are computer numbered so that the transfers are made automatically by computer; thus, there are no check stub receipts available.

Counsel for Fasano, Inc. examined Heckel as to his treatment of several claims submitted by subcontractors on the Griffiss job. Heckel testified regarding thirteen subcontractor's claims and the procedure for payment.

First, Heckel set forth several factors USF & G used to determine whether to pay a subcontractor claim. One of the reasons for payment was to "grease the wheels" which meant that if a subcontractor had ongoing or remaining work to perform, it would receive preference in payment. In addition, if a subcontractor filed suit, USF & G would be more inclined to pay. Out of the thirteen files discussed, most had numerous pieces of correspondences in the file, such as invoices, demands for arbitration and claim letters. However, the Schalk file had only one piece of paper in the file. It was Schalk's claim (Exhibit L).

Heckel testified that in the usual case, most subcontractor claims were referred to CMA for an initial investigation. He stated that Schalk's claim was referred to CMA as

well. However, as the number of claims were increasing and he was pressed for time, Heckel stated he abandoned the general procedure of writing to Schalk to verify receipt of the claim and to ask for proof of performance. Thereafter, CMA returned Schalk's claim to Heckel with instructions to pay the claim in the amount of $2,509.35. Heckel stated he then authorized payment of this amount and directed the regional office in Syracuse, New York to issue the draft.

Heckel testified further that after he authorized the draft to be issued, he compared the $2,509.35 claim as set forth in Exhibit L, Schalk's claim letter, with the amount of Schalk's claim set forth in both Exhibit 73, the CMA spread sheet and Exhibit 26, the accounting of Fasano, Inc. projects as of March 12, 1982. In both these exhibits, the Schalk claim is listed as $1,935.00. At this point, Heckel stated he contacted Frank Webb (hereinafter, Webb) of CMA and asked him to investigate the discrepancy and the timeliness of the claim under the Miller Act statute of limitations, 40 U.S.C. § 270b. As a result, Heckel stated Webb contacted him and informed him the claim was time barred as Schalk had failed to file suit within one year from the date it last performed work or supplied labor or materials on the Griffiss project. At this point, Heckel stated he contacted the Syracuse office and directed it to destroy the check.

Heckel stated further that he did not contact Schalk to inform it regarding the nonpayment because he had little or no time. In his words, he stated "I just put the Schalk file aside and moved on to more claims."

Fasano, Inc. asserts this course of procedure with regard to the Schalk claim suggests USF & G purposely held up payment of Schalk's claim so as to solicit Schalk as a petitioning creditor in this case. Fasano, Inc. asserts that after CMA instructed Heckel to pay Schalk's claim, without any explanation to Schalk, the claim was simply not paid so as to qualify Schalk as a petitioning creditor in this case. In addition,

Fasano, Inc. avers that as Schalk testified the last date of performance on the Griffiss job was on or around May 18, 1981, in fact at the time CMA made its payment decision, the statute of limitations had not yet expired. Further, Fasano, Inc. avers the fact that Schalk's claim file at USF & G contained only one document supports its position that USF & G purposely withheld payment from Schalk.

Moreover, Fasano, Inc. questions the decision of Heckel to cancel payment in the absence of any supporting invoices from Schalk. In addition, Fasano, Inc. avers it is not reasonable that after finding the discrepancy, that Heckel would not issue partial payment for $1,935.00. Moreover, Fasano, Inc. appears to question whether it is reasonable that Heckel's request to Webb to investigate the discrepancy included a request to check the timeliness of the claim, when the latter issue was not apparent at all.

Furthermore, Fasano, Inc. argues that on or about May 9, 1982, when Schalk was contacted by USF & G's Counsel (J. Schalk EBT pg. 29, line 11), Schalk's claim was not time barred against USF & G. Therefore, USF & G's failure to inform Schalk about its viable Miller Act claim is evidence of bad faith. Fasano, Inc. also avers that as USF & G's Counsel was former counsel to Schalk on some unrelated matters, there may have been some form of duty on Mathews to inform Schalk of his bond claim rights. Fasano, Inc.'s position is that the evidence proves USF & G's solicitations were not conducted in good faith and, therefore, Schalk should be disqualified.

In response, USF & G asserts Heckel's actions in processing Schalk's claim were completely reasonable. Moreover, it contends its own actions in soliciting Schalk to become a petitioning creditor were reasonable and not indicative of bad faith. With regard to Heckel's actions, USF & G avers his actions in denying Schalk payment were entirely reasonable under the circumstances. USF & G's version is as follows: After receiving the information regarding Schalk's claim from CMA, Heckel authoriz-

ed the issuance of the draft. Then, he first discovered the discrepancy in the amount of Schalk's claim. Thereafter, he contacted Webb to investigate the discrepancy and also the timeliness of the claim. Subsequently, Webb informed Heckel not to pay the claim as it was time barred. USF & G also objects to Fasano, Inc.'s argument that at the time the original decision to pay Schalk was made, the limitations period had not yet expired. USF & G points to Heckel's statement that if Schalk was doing "punch work" on May 18, 1981, that this would not revive the statute of limitations period.

USF & G asserts it had reason and still has reason to believe Schalk's claim was time barred. In addition, when USF & G solicited Schalk as a petitioning creditor, it did not mislead Schalk in any way and it did not promise Schalk it would be paid. Further, USF & G refers to the absence of any testimony of Schalk suggesting that he was coerced or harassed into joining the petition.

Finally, USF & G argues that even if it is determined that at the time it solicited Schalk to be a creditor the statute of limitations had not expired, it had no duty to inform Schalk as to its viable bond claim. In addition, USF & G argues that had it informed Schalk as to the right to proceed against USF & G, in light of USF & G's position, it is reasonable that Schalk would have still joined the petition. Further, between the time Schalk mailed its claim letter (Exhibit L) to USF & G, and the time USF & G contacted it regarding the involuntary petition, Schalk took no action to recover the debt. Furthermore, USF & G claims the testimony of J. Schalk established it had attorneys which it consulted occasionally, that he consulted with his father, the president of Schalk and that USF & G made no misrepresentations to Schalk at the time it contacted same.

The first issue presented with regard to the good or bad faith of USF & G is what date did Schalk finish its work on the Griffiss project. J. Schalk testified at trial that he finished punch list items around May 18,

1981. J. Schalk also explained the definition of a "punch list" as a list issued by the architect or engineer after substantial completion of the project of items needed to be completed.

The question now becomes when did the statute of limitations under the Miller Act, 40 U.S.C. § 270b, start to run. In determining the time from which the limitations period runs, the pertinent question to ask is "whether the work was performed and the material supplied as a 'part of the original contract' or for the 'purpose of correcting defects, or making repairs following inspection of the project.'" *United States v. Western Elec. Co.*, 337 F.2d 568, 572 (9th Cir.1964). This test has been cited as controlling in numerous circuits. See *e.g.*, *United States v. R.T. Woodfield, Inc.*, 709 F.2d 249 (4th Cir.1983). Therefore, in the instant case, inquiry must be made into the nature of the work performed by Schalk on May 18, 1981. In the EBT taken on March 16, 1983, J. Schalk stated after reviewing two punch lists which were issued on the Griffiss job that *inter alia*, on May 9, 1981, Schalk repaired some small holes in one building and completed ceiling installation in another building. (EBT pg. 22, lines 3–9).

Referring to the *Western Electric* test, *supra* the Court finds that although on May 9, 1981 Schalk performed some repair work, completing ceiling installation is the performance of additional work "as part of the original contract". *United States v. Western Electric Co.*, 337 F.2d at 572. Therefore, the Court finds that the Miller Act limitations period began May 18, 1981 and ran until May 18, 1982, the date of the petitions.

 Turning to the facts as presently before the Court, it is now clear that at the time USF & G contacted Schalk in early May 1982, Schalk's claim was not time barred against USF & G. Utilizing an objective test for determining bad faith, the Court finds USF & G's failure to notify Schalk of its possible Miller Act bond claim evidences bad faith on its part in soliciting Schalk as a petitioning creditor. Additional support for the Court's finding of bad faith is the fact that at the same time USF & G was seeking petitioning creditors to join the involuntary petition, CMA investigated Schalk's claim and without question, originally authorized payment. Then, although a valid discrepancy existed between the amount claimed and Fasano, Inc.'s account payable records, Heckel referred the discrepancy to Webb and, for still unexplained reasons, requested Webb, apparently for the first time, to check on the timeliness of Schalk's claim as well. It does not logically follow that a limitations issue should arise at this point. Thus, the Court finds USF & G's actions in soliciting Schalk constitutes bad faith.

Once an issue of bad faith is determined against a petitioner, courts have taken conflicting positions as to whether the entire case should be dismissed or just that particular petitioner disqualified. Although the question is moot in the instant case, as TSM has already been disqualified, and thus, either course of action will mandate dismissal of the involuntary petition against Fasano, Inc., the Court finds the better course is to dismiss the entire case. *In re Rush*, 10 B.R. 526, 527–28 (Bankr.N. D.Ala.1981); *In re Midwest Processing Co.*, 41 B.R. 90, 101 (Bankr.D.N.D.1984).

 With regard to Vincol and DJF, although only one petitioning creditor is required on their respective petitions, the Court finds that these petitions would not have been filed, but for the involuntary petition filed against the parent company, Fasano, Inc. In view of the close relationship of Vincol and DJF to Fasano, Inc., evidenced by Richardson's testimony that each corporation only had business dealings with Fasano, Inc., the Court finds the bad faith evidenced by USF & G in the Fasano, Inc. case permeates the cases against Vincol and DJF. In addition, when also considering that the testimony established DJF and Vincol had liabilities to income in a ratio of three to one, the Court will order dismissal of the involuntary cases against DJF and Vincol as well.

Therefore, based on the forgoing, it is

ORDERED that the involuntary petitions filed against Fasano, Inc., DFJ and Vincol be, and the same are, hereby dismissed, and it is further

ORDERED that the Court makes no decision at this time concerning the Alleged Debtors' counterclaims in the above actions.